**PELTON GRAHAM LLC**
Brent E. Pelton
Taylor B. Graham
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.PeltonGraham.com

*Attorneys for Plaintiff and the putative*
*FLSA Collective and Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BRYAN AHRENS, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>-against-<br><br>**PHOENIX HOUSES OF LONG ISLAND, INC. d/b/a PHOENIX HOUSES OF NEW YORK & LONG ISLAND,**<br><br>**Defendant.** | **CLASS & COLLECTIVE<br>ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Bryan Ahrens (the "Plaintiff"), individually and on behalf of all others similarly situated, as class and collective representative, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff is a former residential counselor at Defendant's drug and rehabilitation non-profit organization, with several treatment center locations in New York City and Long Island.

1

2.      For his work, Plaintiff was paid on an hourly basis but, pursuant to Defendant's policy, was not permitted to record all of his work hours such that he was not paid for all hours worked including overtime premium pay for hours worked in excess of forty (40) hours in a week.

3.      Additionally, although Plaintiff was provided wage statements with his bi-weekly wage payments, these statements frequently contained an inaccurate record of Plaintiff's hours worked.

4.      Plaintiff brings this action to recover unpaid overtime premiums owed to him pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL"), §§ 650 *et seq*. Plaintiff also brings claims for failure to pay wages for all hours worked and failure to provide proper wage statements, pursuant to NYLL §§ 190 *et seq*. and the supporting regulations.

5.      Plaintiff brings his FLSA claims on behalf of himself and all other similarly situated employees of Defendant and his NYLL claims on behalf of himself and a Federal Rules of Civil Procedure 23 class consisting of hourly-paid counselors, recovery support specialists, and/or recovery support staff who worked for Defendant during the NYLL limitations period.

6.      Further, as a result of Plaintiff's complaints with respect to Defendant's policy of failing to accurately record his total hours worked, Defendant refused to provide Plaintiff with documentation necessary to obtain his mental health counseling license which ultimately resulted in Plaintiff's constructive discharge. Accordingly, Plaintiff also brings individual retaliation claims against Defendant under § 215(a)(3) of the FLSA and § 215 of the NYLL.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§

2

1331, 1337, and 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district and Defendant's business is located in this district.

9.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order

202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a toll of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiff**:

11.    Plaintiff Bryan Ahrens ("Ahrens") was, at all relevant times, an adult individual residing in Suffolk County, New York.

12.    Throughout the relevant time period, Plaintiff performed work at two of Defendant's treatment facilities: 1) Phoenix House of Long Island City—Parkside, located at 34-25 Vernon Boulevard, Long Island City, NY 11106; and 2) Phoenix House of Lake Ronkonkoma—Edward D. Miller Center, located at 153 Lake Shore Road, Lake Ronkonkoma, NY 11779.

13.    Plaintiff consents in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b), and his consent form is attached hereto and incorporated by reference.

**Defendant**:

14.    Defendant Phoenix Houses of Long Island, Inc. d/b/a Phoenix Houses of New York & Long Island ("Phoenix House" or the "Defendant") is a Suffolk County not-for-profit corporation registered with the New York State, Department of State, Division of Corporations on November 7, 1973, and with a NYS DOS Process of Service Address location of 50 Jay Street, Brooklyn, NY 11201.

15.    At all relevant times, the Defendant has been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

4

16.     At all relevant times, Defendant employed, and/or continues to jointly employ, Plaintiff and each of the Collective Action members within the meaning of the FLSA.

17.     At all relevant times, Plaintiff was employed by Defendant within the meaning of the NYLL, §§ 2 and 651.

18.     Upon information and belief, at all relevant times, the Defendant has had gross revenues in excess of $500,000.00.

## FLSA COLLECTIVE ACTION ALLEGATIONS

19.     Pursuant to 29 U.S.C. §§ 207 & 216(b), Plaintiff brings his First Cause of Action as a collective action under the FLSA on behalf of himself and the following collective:

> All persons employed by Defendant at any time since May 20, 2018 and through the entry of judgment in this case (the "Collective Action Period") who worked as hourly counselors, recovery support specialists and/or recovery support staff (the "Collective Action Members").

20.     A collective action is appropriate in this circumstance because Plaintiff and the Collective Action Members are similarly situated, in that they were all subjected to Defendant's illegal policy of failing to pay overtime premiums for work performed in excess of forty (40) hours each week. As a result of this policy, Plaintiff and the Collective Action Members did not receive overtime premium payments for all hours worked in excess of forty (40) hours per week.

21.     Plaintiff and the Collective Action Members have substantially similar job duties and are paid pursuant to a similar, if not the same, payment structure.

## FED. R. CIV. P. 23 CLASS ACTION ALLEGATIONS

22.     Pursuant to the NYLL, Plaintiff brings his Third through Fifth Causes of Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class:

> All persons employed by Defendant in New York State at any time since October 4, 2014 and through the entry of judgment in this case (the "Class Period") who worked as hourly counselors, recovery support specialists, and/or recovery support staff (the "Class Members").

23.     <u>The Class Members are readily ascertainable</u>. The number and identity of the Class Members are determinable from the records of Defendant. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

24.     <u>The Class Members are so numerous that joinder of all members is impracticable</u>. Although the precise number of Class Members is unknown to Plaintiff, the facts on which the calculation of that number can be based are presently within the sole control of Defendant.

25.     Upon information and belief, there are well in excess of forty (40) Class Members.

26.     <u>Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting the individual members of the Class</u>. Such common questions will determine Defendant's liability to all (or nearly all) Class Members. These common questions include, but are not limited to:

a.   whether Defendant employed Plaintiff and the Class Members within the meaning of the NYLL;

b.   whether Defendant failed to keep true and accurate time records for all hours worked by Plaintiff and the Class Members;

c.   whether Defendant failed and/or refused to pay Plaintiff and the Class Members wages for all hours worked;

d.   whether Defendant failed and/or refused to pay Plaintiff and the Class Members

overtime premiums for hours worked in excess of forty (40) hours per workweek;

e.  whether Defendant failed to provide Plaintiff and the Class Members with a proper statement of wages with every wage payment as required by the NYLL;

f.  whether Defendant's failure to properly pay Plaintiff and the Class Members lacked a good faith basis; and

g.  whether Defendant is liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

27.    Plaintiff's claims are typical of the Class Members' claims. Plaintiff and the Class Members are hourly counselors, and/or recovery support specialist employees of Defendant who worked for Defendant pursuant to their corporate policies. Plaintiff, like all Class Members, was, *inter alia*, not paid for all hours worked each week, not paid overtime premium pay for hours worked over forty (40) hours in a given workweek and did not receive proper wage statements. If Defendant is liable to Plaintiff for the claims enumerated in this Complaint, they are also liable to all Class Members.

28.    Plaintiff and his Counsel will fairly and adequately represent the Class. There are no conflicts between Plaintiff and the Class Members, and Plaintiff brings this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover his own damages.

29.    Plaintiff's counsel are experienced class action litigators who are well-prepared to represent the interests of the Class Members.

30.    A class action is superior to other available methods for the fair and efficient

adjudication of this litigation.

31.    Defendant is a sophisticated organization with substantial resources. The individual Plaintiff lacks the financial resources to vigorously prosecute a lawsuit in federal court against the Defendant. The individual members of the Class have no interest or capacity to bring separate actions; Plaintiff is unaware of any other litigation concerning this controversy; and there are no likely difficulties that will arise in managing the class action.

## STATEMENT OF FACTS

### Defendant's Organization

32.     Upon information and belief, Phoenix Houses of Long Island, Inc. is a non-profit organization that has been in existence since 1967 and which provides residential and outpatient treatment for substance and alcohol abuse and mental health services.

33.    Defendant, and its related entities, operates at least eight (8) facilities within the State of New York, including: 1) Phoenix House - Brentwood Mental Health Outpatient and Community Residence; 2) Phoenix House – Brooklyn Community Recovery Center; 3) Phoenix House – East Hampton Outpatient Services; 4) Phoenix House – Hauppauge Residential Services; 5) Phoenix House – Edward D. Miller Center; 6) Phoenix House – Long Island City Parkside; 7) Phoenix House – Mental Health Community Residence in Springfield Gardens; and 8) Phoenix House - Wainscott Residential Services.

34.    Upon information and belief, Defendant hires individual counselors, nurses, and residential support staff specialists to provide therapeutic intervention, rehabilitation, medical treatment, and mental health and substance abuse counseling services tailored to meet its clients' needs. As advertised on the Phoenix House Website, Defendant's services include "assessment,

individualized treatment planning, group counseling, DBT therapy, anger management, relapse prevention, sober recreational activities, and referrals to a network of community service organizations." Further, "[T]reatment is tailored to meet individual needs; hours are flexible and an intensive outpatient option is also available." (https://www.phoenixhouse.org/locations/new-york/long-island-city-center/)

**Plaintiff's Work for Defendant**

35.     Plaintiff Ahrens was employed by Defendant in the position of Primary Residential Counselor from on or about June 4, 2019 through approximately February 10, 2021 (the "Ahrens Employment Period"). Prior to being hired as a Residential Counselor, Plaintiff Ahrens interned for Defendant from approximately February 2019 until approximately May 2019.

36.     Some of Plaintiff's  responsibilities as Primary Residential Counselor included but were not limited to: managing a caseload of up to fifteen (15) clients; ; leading daily group sessions with clients, typically lasting one (1) hour, and then updating the group notes and making entries for each individual client in the group; conducting daily group sessions with clients, typically lasting between thirty (30) minutes to one (1) hour, such that each individual client was met with at least once a week, and then updating the individual counseling notes after each session; assessing client needs and then creating and documenting a comprehensive treatment plan for each client, utilizing a series of forms and checklists; assisting clients with their court-mandated rehabilitative treatment requirements, as well as communicating on at least a bi-weekly basis with probation officers and each clients' legal counsel regarding treatment process and compliance, depending on each client's legal disposition; providing resources to clients related to job-searches and assisting with preparation of resumes, online-based job searches; ensuring and approving

9

client receipt of funds from the NYS Department of Social Services; assisting clients with obtaining social service needs; resolving billing and client health insurance disputes and assisting clients with contacting insurance companies and/or Defendant's Billing Department; conducting state required on-site drills, including internal riot drills where clients pretended to fight, external riot drills, emergency weather drills, "Narcan" drills where clients pretended to overdose, and fire drills; completing forms mandated by the New York State Department of Health as well as internal paperwork required for each client and periodically updating these forms via Defendant's online databases, including "Welligent"; and participating in weekly supervision and weekly and monthly staff meetings.

37.     During his employment, Plaintiff was also instructed to download an application on his phone called "Outlook" so that he could access his email on his personal cell phone. Plaintiff was expected to communicate with supervisors, directors, and co-workers by email, text messages, and phone calls to his cell phone whether or not he was scheduled for a shift during that time or on site.

38.     From the start of his employment period until in or around March 2020, Plaintiff performed work at Phoenix House of Long Island City—Parkside, located at 34-25 Vernon Boulevard, Long Island City, NY 11106. Thereafter, until the end of his employment period, Plaintiff worked at the Phoenix House of Lake Ronkonkoma, located at 153 Lake Shore Road, Lake Ronkonkoma, NY 11779.

39.     Although Plaintiff was initially scheduled to work Tuesday to Saturday from 9:00 a.m. to 6:00 p.m., this schedule fluctuated such that he was often scheduled to work Tuesdays from 8:00 a.m. to 5:00 p.m. and/or 7:00 a.m. to 4:00 p.m., Wednesdays, Fridays, and Saturdays from

9:00 a.m. to 6:00 p.m.; and Thursdays from 12:00 to 9:00 p.m., or a modified schedule depending on employee coverage for those shifts.

40.     Although Plaintiff was frequently told that his workweek consisted of a forty (40)-hour workweek and that his timesheets should reflect as such, he was often required to work past his regular daily schedule to assist clients and complete mandatory paperwork, such that he often worked between approximately forty-five (45) to fifty (50) hours per week.

41.     From in or around early February 2020 until on or about March 15, 2020, Plaintiff took one (1) leave of absence while transitioning from Defendant's Long Island City location to the Lake Ronkonkoma location.

42.     Plaintiff also took one (1) leave of absence in or around December 15, 2020, out of concern when Plaintiff arrived to work for his scheduled shift and discovered that Defendant had unexpectedly transferred in approximately twelve (12) clients from, upon information and belief, Defendant's East Hampton location who had tested positive for COVID-19 to the Lake Ronkonkoma location. Upon information and belief, these twelve (12) COVID-19 positive clients were being relocated to the Lake Ronkonkoma location to be housed there for reasons unbeknownst to Plaintiff. Plaintiff was concerned that Defendant expected the Lake Ronkonkoma staff, to house and treat those twelve (12) COVID-29 positive clients, without any advanced preparation or notice to the staff. After receiving an email on December 16, 2020 from Nicole Cathnott ("Cathnott"), a Human Resources Manager for Defendant, regarding his ineligibility for Paid Family Leave under the Family and Medical Leave Act (FMLA), Plaintiff was told by both Cathnott and another Human Resources Manager, Tawanda Williams ("Williams") that his only option was to come back to work the following Monday or he would be terminated. Plaintiff

requested an accommodation due to his anxiety which caused him to be unable to attend work under those unsafe conditions that Defendant had unexpectedly created. Specifically, Plaintiff inquired about the possibility of temporarily working at an alternate location. That request was denied by Human Resources. Plaintiff ultimately stayed home without pay for approximately two (2) weeks, and agreed to return to the facility under the condition that Defendant would increase safety measures to protect Plaintiff and the staff since the twelve (12) COVID-positive East Hampton clients were now being housed at Lake Ronkonkoma. Defendant promised to install industrial air filters in Plaintiff's office and throughout the facility; however, these air filters were never installed in Plaintiff's office or throughout the facility nor other additional safety measures taken that were promised to Plaintiff.

43.     Other than these two (2) separate occasions, Plaintiff consistently reported to work for all scheduled shifts and frequently worked beyond his regular schedule, including increasingly performing work at home towards the end of 2020.

44.     While working at the Phoenix House Lake Ronkonkoma location from approximately March 16, 2020 until the end of the Ahrens Employment Period, Plaintiff was typically scheduled to work Sunday to Thursdays, with different start and end times each day, including Sundays and Mondays from 8:00 a.m. to 5:00 p.m. and/or 7:00 a.m. to 4:00 p.m., Tuesdays and Thursdays from 12:00 p.m. to 9:00 p.m. and/or 11:00 a.m. to 8:00 p.m., depending on scheduled coverage availability, and Wednesday from 9:00 a.m. to 6:00 p.m., and sometimes as late as 8:00 p.m.

45.     At the Phoenix House Lake Ronkonkoma location, Plaintiff was also instructed that his time sheets should reflect a total of forty (40) hours worked each week, even though he

frequently worked during his lunch period and after his regular shift for a total of approximately between forty-five to fifty (45-50) hours per week. Additionally, during certain pay periods in or around May 2020, Plaintiff worked six (6) days per week instead of his regular five (5) day per week schedule.

46.     Plaintiff was also expected to perform work outside of his regular work schedule and on days when he was out sick or on a leave of absence, including but not limited to: entering log notes; completing mandatory paperwork; and responding to his supervisors and co-worker's requests or questions about his clients, such that he often remained at work or worked from home for at least an additional fifteen (15) minutes up to one (1) hour or more beyond his scheduled shift. Almost daily, Plaintiff was also required to assist with unexpected events requiring crisis management for more serious issues, including: when a client's loved one passed away and was inconsolable; clients engaged in physical or verbal arguments on site; clients stole from each other or from the facility; clients threatened to leave the facility against medical advice or actually left the facility without permission; clients or their visitors snuck in drugs or alcohol to the facility; clients relapsed (including instances during the COVID-19 pandemic when clients were found pouring hand sanitizer into their coffee); clients broke facility property; or clients desecrated the bathroom facilities. Accounting for this additional work, Plaintiff often worked approximately one (1) to two (2) hours in addition to his regularly scheduled hours.

47.     During certain pay periods, Plaintiff was also required to complete annual "Relias" trainings or individual internal trainings for counselors working at an inpatient substance abuse rehabilitation center. These trainings were contained in an online database and were assigned typically every two (2) months on a range of topics including ethics, sexual harassment, "Narcan"

medication training and management, which he sometimes completed outside of his regular work schedule, such that during these pay periods he worked an additional half (½)-hour and sometimes up to three (3) hours, which was not compensated. Plaintiff was instructed that Relias trainings were mandatory and needed to be completed on strict deadlines, and was instructed to complete the trainings on or off the clock – it did not matter so long as the trainings were completed by the mandatory deadlines.

48.     From the start of the Ahrens Employment Period until in or around October 2020, Plaintiff's schedule contemplated a one (1) hour lunch break, although he typically worked through lunch attending to mandatory meetings, completing paperwork, and working with clients, such that during most shifts he was unable to take an uninterrupted thirty-(30) minute lunch break, let alone a full hour. In or around October 2020, Plaintiff was informed that he was entitled to a thirty (30) minute lunch break each shift, which Plaintiff believes was an update to Defendant's prior policy, which originally required Plaintiff to schedule a one (1) hour lunch break. As part of this change, Plaintiff was allowed during certain shifts to leave work thirty (30) minutes before the end of his scheduled shift (e.g., at 4:30 p.m.) as long as his timecard only reflected a 30-minute lunch break, regardless of whether Plaintiff actually took a lunch break.

49.     Plaintiff's paystubs state that from May 27, 2019 until approximately March 15, 2020, Plaintiff was paid $21.63 per hour, $23.0770 per hour from in or around March 16, 2020 until approximately in or around April 26, 2020, and lastly $24.0090 per hour from April 27, 2020 until the end of his employment in or around February 28, 2021.

50.     With the exception of certain pay periods in or around July 2019 and May 2020 when Plaintiff was required to work additional hours due to staff shortage, Plaintiff was not paid

overtime premiums for all hours worked in excess of forty (40) hours per week.

51.     Throughout his employment, Plaintiff typically received his wages via direct deposit from Defendant's payroll provider, Automatic Data Processing ("ADP").

52.     Throughout his employment, Plaintiff was required to complete timecards via the ADP portal to record his hours worked.

53.     As part of Defendant's policy, Plaintiff was instructed to submit a bi-weekly timecard reflecting that he took a lunch break, regardless of whether he took the lunch break or not.

54.     Upon information and belief, Defendant's upper-management, including Plaintiff's direct supervisors, were either aware of and/or encouraged Plaintiff and other hourly counselors, RSS support staff and overnight staff to work through lunch breaks, work at home, or stay on-site and continue to work after their shift was scheduled, as part of Defendant's policies, practices, and procedures with respect to time-keeping and payroll records.

55.     Throughout the Ahrens Employment Period, Plaintiff was frequently instructed by members of management, including Wendy Holloway, a Clinical Supervisor, Dan Boylan ("Boylan"), the Program Director of the Lake Ronkonkoma location, and "Mark Restivo" to respond to emails and correspondence outside of his regular scheduled work time, including on days off. Plaintiff was in fact at times admonished if he did not respond to emails and other correspondence before or after his shifts and while he was home or off-site, despite the fact that he was not being compensated for that work time.

56.     Although Plaintiff was required to service and respond to directors, supervisors, and coworkers' inquiries about his clients outside of his regular schedule, Plaintiff, as well as other

employees who worked as hourly counselors, residential support staff ("RSS") and overnight staff, were repeatedly reminded that timecards should reflect a forty (40) hour work week, and that lunch breaks should be included in the timecards at all times.

57.     Upon information and belief, in or around February 2020, Defendant installed a time clock system at the Long Island City location. At no point during the Ahrens Employment Period, was a time clock system installed while Plaintiff worked at the Lake Ronkonkoma location.

58.     In or around February 2020, Plaintiff received a group email correspondence from Katrina Hunter (hereinafter referred to as "Hunter"), a Clinical Director at the Long Island City facility, stating, among other things, "In approving timecards, I notice there is a significant amount of overtime since the implementation of the time clock. I need you to know that I have to request approval for overtime, with permission granted beforehand."

59.     On April 24, 2020, Plaintiff received a group email correspondence from one of his supervisors, Vincent Lopreto stating that "Timecards should reflect a 40-hour work week unless authorized and approved."

60.     Throughout his employment with Defendant, Plaintiff attended staff meetings with respect to Defendant's policies, practices, and procedures for maintaining records of the hourly staff's work attendance. During those meetings, all hourly employees that were present were instructed to submit bi-weekly timecards at the end of every payroll cycle. During those meetings and in those emails, the hourly staff was instructed that those bi-weekly timecards should be identical to their scheduled shifts.

**Defendant's Retaliation Against Plaintiff Ahrens**

61.     As stated above, Plaintiff initially performed work for Defendant as a student intern

from approximately February 2019 until May 2019, while attending graduate school.

62.     When Plaintiff's internship was ending, Plaintiff applied for the Residential Counselor position. During his interview, Plaintiff informed Defendant that he was about to graduate with his master's degree in counseling and would be seeking his counseling license during his employment as a Residential Counselor, which required Plaintiff to complete 3,000 hours of counseling experience. In fact, Plaintiff specifically sought employment as a Residential Counselor with Defendant because Defendant is recognized as a qualified "setting" for a counseling licensure applicant to obtain 3,000 hours of required counseling experience.

63.     At the interview for the Residential Counselor position, Plaintiff informed his interviewers, Hunter, and Joan Avedesian ("Avedesian"), a Program Director at the Long Island City location, that he needed a supervisor to submit on his behalf an application to the State for a limited permit, pursuant to New York State regulations. He explained that, since he was not yet licensed to practice counseling, the State strictly required that his hours be supervised by a "licensed professional" at the setting where the limited permit was issued who would be responsible for keeping track of his hours.

64.     After the interview, Defendant offered Plaintiff the position of Residential Counselor at Defendant's Long Island City location. Upon Plaintiff's graduation, Plaintiff transitioned from the intern position to the Residential Counselor position in May 2019.

65.     Upon information and belief, on or about June 2019, Hunter voluntarily agreed to supervise Plaintiff, and she directly submitted Plaintiff's limited permit application to the State on Plaintiff's behalf in order to become his "Limited Permit Supervisor".

66.     On or about July 29, 2019, Bryan received the limited permit, listing Hunter as his

Supervisor. During the entire duration of Plaintiff's employment at the Long Island City location, Hunter was Plaintiff's only Limited Permit Supervisor.

67. On or about July 30, 2019, Plaintiff informed Hunter that "I received the email last night issuing me my limited permit. I just wanted to touch base with you and let you know that I can start to count my hours." To which Hunter replied, "Yay! I'll touch base with you today."

68. Upon becoming Plaintiff's Limited Permit Supervisor, Plaintiff and Hunter discussed that Plaintiff would start counting his hours towards his license requirements. Plaintiff started tracking his hours that he worked on his own, and since he frequently worked no less than nine (9) hours per day and often was required to work during his lunch breaks, he recorded that time towards his 3,000 hours.

69. Early on during the first few months of Plaintiff's full-time employment, on at least one (1) occasion, Plaintiff was contacted by Human Resources and told that he was not allowed to submit timecards which did not reflect a lunch break, and that Plaintiff needed to start recording a lunch break, regardless of whether he actually took a lunch break, because it was unacceptable for Plaintiff to be receiving overtime pay. Accordingly, Plaintiff started to "clock a lunch" on his timecards, despite the fact that he continued to work through his lunch breaks.

70. Upon information and belief, Plaintiff contacted Hunter to inform her that Plaintiff would continue recording at least nine (9) hours per day because, while he understood Defendant's policy was not to pay its hourly employees for time spent working during a scheduled lunch break, Plaintiff was actually working at least 9 hours per day towards his 3,000-hour requirement. Hunter confirmed that Plaintiff should keep recording 9 hours a day for his 3,000-hour requirement.

71. In addition, Hunter directed Plaintiff to meet with different supervisors, and then

Hunter would check in with Plaintiff to supervise his hours. Pursuant to Hunter's directions, Plaintiff regularly met with his assigned supervisors.

72.     Plaintiff transferred to Defendant's Lake Ronkonkoma location in or about February 2020. After his transfer, Plaintiff requested that a different licensed professional take over the limited permit supervisor duties for Plaintiff's hours at Lake Ronkonkoma. The new limited permit supervisor, Leann McCabe ("McCabe"), applied for Plaintiff's second limited permit, and Plaintiff received a new limited permit for the Lake Ronkonkoma location.

73.     During the first few weeks of Plaintiff's employment at the Lake Ronkonkoma location in March 2020, the COVID-19 pandemic emerged. Plaintiff played an active role in helping Defendant adjust its counseling services during the COVID-19 pandemic and frequently took on additional responsibilities. In or about May 2020, Plaintiff attended a meeting in which both Boylan and McCabe were present wherein they praised Plaintiff's work during the COVID-19 pandemic, and told Plaintiff that he was the "best counselor they had" and that he was in line to be promoted to the Clinical Supervisor position with Defendant at the Lake Ronkonkoma location.

74.     Upon information and belief, all of the Clinical Supervisors at the Lake Ronkonkoma location known to Plaintiff have either a counseling license or a social work license. Plaintiff knew that he needed his license in order to receive that promotion, and continued to record his hours worked to facilitate the paperwork as soon as he fulfilled the required 3,000 hours.

75.     On December 31, 2020, Plaintiff contacted Hunter to inform her that he had completed his 3000 LMHC hours.

76.     Plaintiff was shocked and immediately became concerned by Hunter's response, in

which she asked him: "Did we meet for supervision?" Later that day, in another email, Hunter stated: "I don't remember ever meeting with you for supervision."

77.    On January 5, 2021, Plaintiff contacted Hunter again to follow up regarding Hunter's records of Plaintiff's hours. Distraught, Plaintiff wrote to Hunter: "I'm just confused because when I started working with Phoenix House in June of 2019 and I requested that I have supervision for my LMHC hours this was the arrangement that was agreed upon by all leadership and I was assured this would not be a problem when the time came to sign off on my completed hours."

78.    Plaintiff's concerns grew deeper as Hunter continued to excuse her own failure to keep accurate records of Plaintiff's hours. Hunter ultimately stated: "There is no problem with signing off on hours" but also that she would get back to him as to whether she would actually sign off on all of Plaintiff's hours. After Hunter's January 5, 2021 response to Plaintiff's email, Plaintiff did not hear from Hunter again for over one (1) month. In fact, Hunter ignored Plaintiff's numerous attempts to contact Hunter by email, phone call, or text messages.

79.    Over the course of the entire month of January and the first two weeks of February 2021, as explained further below, Plaintiff made multiple complaints to management and eventually to Human Resources about Hunter's refusal to verify his actual hours worked.

80.    Plaintiff also sought guidance from New York State on the supervisory requirement and thereafter reached out by phone, email and spoke in person directly to at least four (4) members of management who were licensed and had directly supervised Plaintiff and/or Hunter. Plaintiff asked these individuals to review records of Plaintiff's hours and to consider submitting the forms to the State on his behalf.

81.     In fact, because no forms were ever submitted to the State, Plaintiff was unable to get his license and was stripped of the promotion to the Clinical Supervisor position that he was in line to receive.

82.     On February 9, 2021, approximately five (5) weeks after Hunter told Plaintiff that she would get back to him as to whether or not she would submit his forms, to Plaintiff's dismay, Hunter told Plaintiff that she was refusing to sign off on all of his hours that he worked at the Long Island City location.

83.     On February 10, 2020, Plaintiff called Defendant's Human Resources department located in Long Island City and complained that Defendant and Hunter had not kept accurate records of his hours and that Plaintiff believed that they were retaliating against him for raising this concern. Plaintiff spoke to Williams, who told Plaintiff that this was a personal problem and that she did not want to get involved.

84.     After the phone call with Williams, Plaintiff submitted his resignation on or about February 10, 2021, providing two (2) weeks' notice (the "First Resignation"). Plaintiff was forced to quit his job with Defendant due to concerns that Defendant's management team had specifically retaliated against him by refusing to submit required forms to the State and interfering with his license to practice counseling as a result of the multiple complaints regarding the inaccurate record of the number of hours he had worked.

85.     On or about February 10, 2021, after submitting his First Resignation, Plaintiff went to Boylan's office to explain in greater detail why he could no longer work for Defendant given the retaliatory backlash he received from management over their refusal to verify his hours to the State for his licensure. At that meeting, upon information and belief, Boylan asked Plaintiff if he

would reconsider his resignation if Boylan could speak with the CEO, Ann-Marie Foster, in order to resolve the issue. Plaintiff told Boylan that he was distraught under the circumstances and therefore could not commit to anything at that time.

86.     Shortly after their February 10 meeting, Boylan told Plaintiff that he tried to contact Foster, but she did not respond. Boylan suggested that Plaintiff should contact the CEO himself. On February 11, 2021, Plaintiff contacted Avedesian, who had been present at his initial interview, and Mark White ("White") to discuss the issues with the certification of his hours. Upon information and belief, White is General Counsel and Chief Operating Officer (COO) of Defendant.

87.     In an email dated February 12 2021, White claimed that Defendant's payroll records showed that as of January 31, 2021, Ahrens had only worked 2,735 hours as opposed to the 3,001 hours listed on his draft application. White also claimed that Plaintiff only worked 34 hours per week. More alarming, White called attention to and mocked Plaintiff's relating his anxiety to Defendant and requesting an accommodation due to his mental health condition in an unrelated matter. White also accused Plaintiff of seeking his license so that he could work from home, all of which White claimed played a part in forming the basis for Defendant's refusal to submit Plaintiff's forms to the State. At no point prior to this exchange had Plaintiff Ahrens been reprimanded due to poor work performance, lateness or other reasons.

88.     Upon information and belief, White's surprising statements about Plaintiff's integrity and mental health were intended to call into question Plaintiff's character, and accuse Plaintiff of unethical and unprofessional behavior, in order to cause Plaintiff emotional distress and deter him from continuing to complain about Defendant and Hunter's time-keeping practices.

89.     After hearing White's false statements about Plaintiff's work history, specifically, that Plaintiff was late to work and left early, and only worked 34 hours a week, as well as the commentary about Plaintiff's mental health, and false accusations that Plaintiff only wanted to obtain his license so that he could work remotely, Plaintiff submitted a second resignation letter to Defendant during his shift on Sunday, February 14, 2021 (the "Second Resignation") retracting the two weeks' notice he had provided in his First Resignation Letter.

90.     Upon information and belief, Plaintiff was retaliated against for asserting his rights under the FLSA and NYLL, particularly with respect to the inaccuracy of Defendant's payroll records, complaints about his unpaid hours, and his contention over the actual number of hours he worked.

**<u>Defendant's Unlawful Corporate Policies</u>**

91.     Plaintiff and the Class Members were all paid pursuant to the same corporate policies of Defendant, including failing to pay wages for all hours worked and the legally required overtime premiums for hours worked over forty (40) in a workweek.

92.     Defendant has not provided Plaintiff or Class Members with proper statement of wages containing the dates of work covered by their wage payments; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the complete and total number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

93.     Upon information and belief, all of Defendant's counselors and/or recovery support staff were not paid one and one-half (1.5) times their regular rate for all hours they worked in

excess of forty (40) hours per week, on account of Defendant's policy requiring Plaintiff and Class Members to record up to forty (40) hours per week, regardless of the actual hours that they worked.

94.     Upon information and belief, throughout the Class Period and continuing until today, Defendant failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

## FIRST CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME
### (Brought on Behalf of Plaintiff and the Collective Action Members)

95.     Plaintiff, on behalf of himself and the Collective Action Members, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

96.     By failing to pay Plaintiff overtime at a rate not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of 40 hours per week, Defendant has violated and continues to violate the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

97.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

98.     Defendant's failure to pay overtime caused Plaintiff and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiff and the Collective Action Members are entitled to recover from Defendant their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNLAWFUL RETALIATION**
**(Brought on Behalf of Plaintiff Ahrens, Individually)**

99.    Plaintiff Ahrens repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

100.    Plaintiff Ahrens engaged in protected conduct when he complained about his unpaid hours and complained about Defendant's failure to keep accurate time records.

101.    Plaintiff Ahrens attempted to enforce his rights pursuant to the Fair Labor Standards Act by inquiring with Defendant regarding hours of work, including overtime hours, for which he was not paid any wages.

102.    Plaintiff Ahrens' actions were protected activity under the FLSA.

103.    Defendant retaliated against Plaintiff Ahrens by refusing to submit mandatory forms to the State in order for Plaintiff Ahrens to obtain his license to practice counseling, which prevented Plaintiff from legally practicing mental health counseling without a license and stripped Plaintiff of the opportunity to obtain a promotion to the Clinical Supervisor position, resulting in Plaintiff's constructive discharge.

104.    In addition, the unsubstantiated accusations made by Defendant's upper management regarding Plaintiff's work performance raised only after Plaintiff Ahrens' complaints about Defendant's failure to keep accurate records, were specifically intended to harass, intimidate, and deter Plaintiff Ahrens from continuing to inquire regarding his unpaid hours, causing him emotional distress.

105.    Such actions are sufficient to dissuade any reasonable employee from enforcing his or her rights under the FLSA, and ultimately led Plaintiff Ahrens to abandon seeking the promotion

to the Clinical Supervision as well as to terminate his employment.

106.    By engaging in the retaliatory acts alleged herein, Defendant retaliated against Plaintiff Ahrens by initially refusing to sign and further delaying the documentation required for his counseling license, and penalized him in violation of the FLSA, 29 U.S.C. § 215(a)(3).

107.    Plaintiff Ahrens has suffered emotional distress as well as damages, including but not limited to loss of wages, punitive damages and interest.

108.    Plaintiff Ahrens is entitled to monetary relief, including but not limited to compensatory and other damages, including emotional distress damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiff and the Class Members)**

109.    Plaintiff, on behalf of himself and the Class Members, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

110.    Defendant willfully violated Plaintiff's and the Class Members' rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

111.    Defendant's failure to pay overtime premium compensation caused Plaintiff and the Class Members to suffer loss of wages and interest thereon. Plaintiff and the Class Members are entitled to recover from Defendant their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs

and disbursements of the action pursuant to NYLL §§ 663(1) et seq.

## FOURTH CAUSE OF ACTION
## NEW YORK LABOR LAW – FAILURE TO PAY WAGES
### (Brought on Behalf of Plaintiff and the Class Members)

112.    Plaintiff, on behalf of himself and the Class Members, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

113.    Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiff and the Class Members, employed by non-profitmaking organizations are entitled to receive all their wages as specified in their terms of employment. As specified in Plaintiff's Letter of Employment, it is Defendant's policy to pay Plaintiff and the Class Members on a bi-weekly basis, "every other Friday (26 pay periods a year)."

114.    Defendant's failure to pay Plaintiff and the Class Members wages of any kind for all time spent performing non-manual labor and assisting client's needs and/or performing mental health and substance abuse counseling, crisis management, responding to supervisor inquiries and requests and completing mandated paperwork outside of their regular scheduled hours, violated NYLL § 191.

115.    Defendant's failure to comply with NYLL § 191 caused Plaintiff and the Class Members to suffer loss of wages and interest thereon. Plaintiff and the Class Members are entitled to recover from Defendant their full unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) et seq.

**FIFTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – WAGE STATEMENT VIOLATIONS**
**(Brought on Behalf of Plaintiff and the Class Members)**

116.    Plaintiff, on behalf of himself and the Class Members, repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

117.    Defendant has willfully failed to supply Plaintiff and Class Members with an accurate statement of wages as required by NYLL, Article 6, § 195(3).

118.    Due to Defendant's violations of the NYLL, Plaintiff and the Class Members are entitled to recover from Defendant two hundred and fifty dollars ($250) per employee for each day that the violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000) per employee, as provided for by NYLL, Article 6, §§ 190 et seq., liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**SIXTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNLAWFUL RETALIATION**
**(Brought on Behalf of Plaintiff Ahrens, Individually)**

119.    Plaintiff Ahrens repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

120.    Plaintiff Ahrens engaged in protected conduct when he complained about his Limited Permit Supervisor's failure to accurately record his hours worked, complained about his unpaid hours, and complained about Defendant's failure to keep accurate records. Upon receiving notice of Plaintiff Ahrens' concerns that Defendant's records did not account for all hours he worked throughout his employment period, Defendant retaliated against Plaintiff Ahrens and

engaged in conduct to prevent Plaintiff Ahrens from continuing to raise his concerns over his unpaid hours and wages, by unnecessarily delaying and refusing to submit the necessary paperwork for obtaining his license to practice counseling, and ultimately leading to Plaintiff's constructive discharge.

121.    In addition, comments made by certain members of upper-management and Human Resources about Plaintiff's mental health condition and his accommodations request in an unrelated matter, that were brought up during conversations about Plaintiff's unpaid hours and in relation to Plaintiff's complaints about Defendant's failure to keep accurate records, were specifically intended to cause Plaintiff Ahrens emotional distress and deter him from filing additional and formal complaints about his unpaid hours.

122.    Plaintiff Ahrens attempted to enforce his rights pursuant to the New York Labor Law by inquiring with Defendant regarding hours of work, including overtime hours, for which he was not paid any wages.

123.    Plaintiff Ahrens' actions were protected activity under the NYLL.

124.    Such actions are sufficient to dissuade any reasonable employee from enforcing his or her rights under the NYLL, and ultimately led Plaintiff Ahrens to terminate his employment.

125.    Notice of this claim has been served upon the New York State Attorney General, pursuant to NYLL § 215(2).

126.    Plaintiff Ahrens has suffered damages, including but not limited to loss of wages, punitive damages and interest.

127.    Plaintiff Ahrens is entitled to monetary relief, including but not limited to compensatory and other damages, including compensatory emotional distress damages, reasonable

attorneys' fees and costs, punitive damages, and other appropriate relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and all other similarly situated Collective Action Members and Class Members, respectfully requests that this Court grant the following relief:

a. Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiff and his counsel to represent the Collective Action Members;

b. Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on behalf of the Class Members and appointing Plaintiff and his counsel to represent the Class;

c. An order tolling the statute of limitations;

d. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

e. An injunction against Defendant and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendant, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

f.   An award of compensatory damages as a result of Defendant's failure to pay overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.   An award of liquidated and/or punitive damages as a result of the Defendant's willful failure to pay overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

h.   An award of compensatory damages as a result of Defendant's failure to pay wages for all hours worked pursuant to the NYLL and supporting regulations;

i.   An award of liquidated and/or punitive damages as a result of the Defendant's willful failure to pay wages for all hours worked pursuant to the NYLL and supporting regulations;

j.   Two hundred and fifty dollars ($250) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(3) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000) per Plaintiff and each of the Class Members as provided for by NYLL, Article 6 § 198(1)-d;

k.   An award of compensatory damages for the economic damages and emotional distress, pain and suffering caused by Defendant's retaliation against Plaintiff Ahrens;

l.   An award of punitive damages under the FLSA for retaliation;

m.   An award of punitive damages under the NYLL for retaliation;

n.   An award of prejudgment and post-judgment interest;

o.      An award of costs and expenses of this action together with reasonable attorneys'

and expert fees; and

p.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised by the complaint.

Dated:  New York, New York
        May 20, 2021

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____
        Brent E. Pelton, Esq.
        Pelton@PeltonGraham.com
        Taylor B. Graham, Esq.
        Graham@PeltonGraham.com
        111 Broadway, Suite 1503
        New York, New York 10006
        Telephone: (212) 385-9700
        Facsimile: (212) 385-0800

        *Attorneys for Plaintiff and the putative*
        *FLSA Collective and Class*

**Notice of Shareholder Liability for Services Rendered**
**Pursuant to § 630 of the Business Corporation Law of New York**

Pursuant to the provisions of § 630 of the Business Corporation Law of New York ("NYBCL"), the ten (10) largest shareholders of PHOENIX HOUSES OF LONG ISLAND, INC. are hereby notified that the Plaintiff in this matter, individually and on behalf of the putative FLSA collective and the Class he seeks to represent, intends to enforce your personal liability, as the ten (10) largest shareholders of PHOENIX HOUSES OF LONG ISLAND, INC. and charge you with indebtedness of said corporations to the Plaintiff for services performed for the corporation as employees during the six (6) year period preceding the filing of the complaint.

Services for the above-referenced corporation were terminated on or about February 10, 2021, within the statutorily-required 180 days.

Dated:  May 20, 2021

_____
Brent. E. Pelton

DocuSign Envelope ID: FB3F749E-FDB3-49E2-BA39-8B886602F424

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Phoenix House and/or its owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

Bryan Ahrens
_____
Printed Name

_____
Signature